# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
### MIDDLE DIVISION

| | |
|---|---|
| **MARY BRANNON, et al.,** | ) |
| | ) |
| **Plaintiffs,** | ) |
| | ) |
| **v.** | ) **Case No.: 4:13-CV-1229-VEH** |
| | ) |
| **ETOWAH COUNTY COURT** | ) |
| **REFERRAL PROGRAM, LLC, et** | ) |
| **al.,** | ) |
| | ) |
| **Defendants.** | ) |

---

## MEMORANDUM OPINION

## I.    INTRODUCTION AND PROCEDURAL HISTORY

Plaintiffs[1] initiated this civil rights lawsuit and purported class action on July 1, 2013, against Defendants City of Gadsden ("COG"), the Etowah County Court Referral Program, LLC (the "ECCRP"), and the ECCRP's Executive Director, Lenesha Zaner ("Ms. Zaner").[2] (Doc. 1). Plaintiffs have amended their complaint

---

[1] The six Plaintiffs currently in the case are Mary Brannon as the personal representative for the estate of Kimberly L. Brannon ("Ms. Brannon"), Joseph R. Dubose ("Mr. Dubose"), Dustin A. Loyd ("Mr. Loyd"), Jason L. Lynn ("Mr. Lynn"), Erica Snow ("Ms. Snow"), and Roy Myers ("Mr. Myers").

[2] Initially, this lawsuit also involved additional Plaintiffs who had brought similar claims against the City of Attalla ("COA"), the ECCRP, and Ms. Zaner. However, on May 20, 2015, the Court severed all the claims of the Attalla Plaintiffs from this action–*Hunter, et al. v. City of Attalla, et al.*, No. 4:15-CV-0839-VEH. (Doc. 70). Mr. Loyd is a Plaintiff in this action as well as in the severed *Hunter* case.

multiple times. The last version was filed on April 9, 2015. (Docs. 22, 43, 45, 63). By virtue of the pro tanto stipulated dismissal entered on July 12, 2017 (doc. 171), COG is no longer a party to this action.

Pending before the Court is the Amended/Corrected Motion for Summary Judgment (doc. 162) (the "Motion") filed by the remaining Defendants–Ms. Zaner and the ECCRP–on June 30, 2017. The Court has reviewed the parties' filings offered in support of and opposition to the Motion. (Docs. 136, 137, 139-1, 140, 142, 143, 163-67, 172). For the reasons set out below, the Motion is granted in part and otherwise denied or termed as moot.

## II.    SUMMARY JUDGMENT STANDARD

Summary judgment is proper only when there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. FED. R . CIV. P. 56(a). All reasonable doubts about the facts and all justifiable inferences are resolved in favor of the non-movant. *See Fitzpatrick v. City of Atlanta*, 2 F.3d 1112, 1115 (11th Cir. 1993). A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). "Once the moving party has properly supported its motion for summary judgment, the burden shifts to the nonmoving party to 'come forward with specific facts showing that there is a genuine issue for trial.'" *International Stamp*

*Art, Inc. v. U.S. Postal Service*, 456 F.3d 1270, 1274 (11th Cir. 2006) (citing

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986)).

## III.    FACTUAL BACKGROUND[3]

All Plaintiffs have been convicted and/or pled guilty to one or more

misdemeanor offensives within the jurisdiction of the Gadsden Municipal Court (the

"GMC"). Plaintiffs' civil rights suit challenges Defendants' practices under a court

referral program (the "CRP") that the GMC ordered Plaintiffs to participate in as a

requirement of their probation and a suspension of their sentences tied to their

misdemeanor cases.

Plaintiffs have summarized their respective GMC and CRP proceedings (doc.

163 at 9-33 ¶¶ 1-105) as follows:[4]

---

[3] Keeping in mind that when deciding a motion for summary judgment the Court must view the evidence and all factual inferences in the light most favorable to the party opposing the motion, the Court provides the following statement of facts. *See Optimum Techs., Inc. v. Henkel Consumer Adhesives, Inc.*, 496 F.3d 1231, 1241 (11th Cir. 2007) (observing that, in connection with summary judgment, a court must review all facts and inferences in a light most favorable to the non-moving party). This statement does not represent actual findings of fact. *See In re Celotex Corp.*, 487 F.3d 1320, 1328 (11th Cir. 2007). Instead, the Court has provided this statement simply to place the Court's legal analysis in the context of this particular case or controversy.

[4] The nature of this Court's opinion on summary judgment does not require it to address the bulk of the voluminous facts admitted and/or contested by the parties. Instead, the Court's analysis turns upon the additional undisputed facts proposed by Plaintiffs that Defendants have not objected to in their reply. The designation "CAF" stands for a fact added by the Court that helps to clarify the status of the evidentiary record before it on summary judgment.

# MS. BRANNON

On April 3, 2008, Ms. Brannon was sentenced by the GMC on a misdemeanor charge of unlawful possession of drug paraphernalia (MC08-0033). Ms. Brannon received a suspended 180-day jail sentence and, as a condition of her probation, the GMC ordered her to enroll in the CRP.

On November 21, 2008, Ms. Brannon was charged with DUI. On December 18, 2008, an order of contempt was stamped on Ms. Brannon's case action summary sheet and she was ordered to serve five days in jail. There is no written order from the GMC requiring Ms. Brannon to restart or return to the CRP. At the same time, the record lacks any evidence of a written order from the GMC indicating that Ms. Brannon's obligation to complete the CRP was no longer a condition of her suspended sentence for her unlawful possession case. CAF.

Ms. Brannon was booked into jail on December 18, 2008, pursuant to the contempt order issued by the GMC (pertaining to her DUI charge while still on probation for her unlawful possession charge). She was released on December 23, 2008. On August 19, 2009, the ECCRP issued a return to court form notifying the GMC that Ms. Brannon had been terminated from the CRP for failure to report for two color-code drug screens and because she allegedly received a new DUI charge on July 31, 2009.

The form also requested the GMC to issue a warrant for Ms. Brannon's arrest. On August 28, 2009, a warrant was issued for Ms. Brannon on case number TR08-4028. The warrant was executed on October 20, 2009.

On October 20, 2009, Ms. Brannon was also sentenced on case number TR08-4028. She received a 60-day jail sentence and an order for 24-months of probation. She was also ordered to enroll in the CRP.

On January 12, 2010, the ECCRP issued a return to court form, referencing both of Ms. Brannon's case numbers, notifying the GMC that Ms. Brannon had been terminated from the CRP because she had provided a diluted sample for a drug test and had trace amounts of marijuana in her sample. The form also requested the GMC to issue a warrant for her arrest.

On February 17, 2010, the GMC issued a warrant for Ms. Brannon on case number MC08-0033–the unlawful possession case. The warrant was executed on March 24, 2010, and Ms. Brannon was arrested. Ms. Brannon spent one day in jail, as she was released on the same day.

On April 15, 2011, the ECCRP issued a return to court form, referencing both of Ms. Brannon's case numbers, notifying the GMC that Ms. Brannon had been terminated from the CRP because she had not attended enough self-help meetings, had failed to report for multiple color-code drug screens, and produced an altered

sample. The form also requested the GMC to issue a warrant for her arrest.

On May 5, 2011, Ms. Brannon was arrested and served five days in jail. She was released on May 10, 2011. There is no written contempt order nor is there a written order to restart, resume, or return to the CRP. At the same time, the record lacks any evidence of a written order from the GMC indicating that Ms. Brannon's obligation to complete the CRP was no longer a condition of her suspended sentence for either one of her misdemeanor cases. CAF.

On May 16, 2011, the ECCRP issued a return to court form notifying the GMC that Ms. Brannon had failed to report to the CRP after her release from jail on May 10, 2011. The form also requested the GMC to issue a warrant for her arrest.

On January 26, 2012, the ECCRP issued a return to court form notifying the GMC that Ms. Brannon had been terminated from the CRP because of her failure to report for two color-code drug screens. The form also requested the GMC to issue a warrant for her arrest.

Spanning the course of four years, there is only one contempt order stamped on Ms. Brannon's case action summaries. There are no written orders from the GMC that require Ms. Brannon to restart, resume, or return to the CRP after she had been terminated from it due to noncompliance. Likewise, there are no written probation revocation orders, probation extension orders, or orders extending Ms. Brannon's

suspended sentence(s). At the same time, the record lacks any evidence of a written order from the GMC indicating that Ms. Brannon's obligation to complete the CRP was no longer a condition of her suspended sentence for either one of her misdemeanor cases. CAF.

As noted above, Ms. Brannon received a suspended sentence in her original case (MC08-0033) on March 3, 2008. Ms. Brannon contends that the statutory maximum period for probation, the suspended sentence, and/or her compliance with the CRP should have expired on March 3, 2010, for that possession of drug paraphernalia offense. Ms. Brannon additionally received a suspended sentence in her second misdemeanor case (TR08-8028) on October 20, 2009. Ms. Brannon contends that the statutory maximum period for that DUI case expired on October 20, 2011.

Ms. Brannon continued to be subjected to the CRP requirements until at least January 2012. After October 20, 2011, Ms. Brannon was scheduled for at least one CRP evaluation, monitored by the ECCRP at least fifteen times, color-coded at least fifteen times, called by the ECCRP at least once, returned to the GMC at least twice, and required to attend the CRP self-help meetings. Ms. Brannon was also charged drug testing fees, monitoring fees, and/or late fees at least 38 times. Ms. Brannon maintains that she was also arrested and incarcerated as a direct result of her failure or inability to comply with the CRP requirements after the statutory maximum period

had expired.

## MR. DUBOSE

On October 6, 2009, Mr. DuBose was sentenced by the GMC on a misdemeanor charge of DUI (TR09-2369). Mr. DuBose received a suspended 180-day jail sentence and, as a condition of probation, was ordered to enroll in the CRP.

On January 15, 2010, Mr. DuBose received from the ECCRP and signed a notice requiring him to appear in the GMC on January 21, 2010, because of testing positive for opiates. That same notice has a contempt stamp from the GMC dated January 21, 2010, showing that Mr. DuBose was found in contempt and ordered to serve five days in jail. The GMC record does not show any contempt stamps at all.

On March 31, 2010, the ECCRP issued a return to court form notifying the GMC that Mr. DuBose had been terminated from the CRP because he failed to attend a required monitoring session, treatment assessment, and color-code drug screening. The form also requested the GMC to issue a warrant for Mr. DuBose's arrest.

On April 28, 2010, the GMC issued a warrant for Mr. DuBose's arrest. The warrant was executed on May 13, 2010, and Mr. DuBose was arrested. There is no written order from the GMC requiring Mr. DuBose to restart, resume, or return to the CRP after his termination from it, his subsequent arrest, and release from jail. At the

same time, the record lacks any evidence of a written order from the GMC indicating that Mr. DuBose's obligation to complete the CRP was no longer a condition of his suspended sentence for his DUI case. CAF.

Mr. DuBose returned to the ECCRP on May 19, 2010, when he signed a new color-code agreement. On February 7, 2011, the ECCRP issued a return to court form notifying the GMC that Mr. DuBose has been terminated from the CRP for his failure to attend required monitoring sessions and his failure to report for a color-code drug screen. The form also requested the GMC to issue a warrant for his arrest for these CRP violations.

The GMC issued the warrant on February 23, 2011. The warrant was executed on May 8, 2011, and Mr. DuBose was arrested. Mr. Dubose served twelve days in the county jail and on May 20, 2011, he was released to Rapha, a mental health and substance abuse treatment center located in Attalla, Alabama. Mr. DuBose was released from Rapha on August 27, 2011, and his written "exit information" does not mention anything about needing to report back to the ECCRP to complete the CRP.

After the ECCRP provided the GMC with notice of Mr. DuBose noncompliance with the CRP in February 2011, there is no written order from the GMC requiring Mr. DuBose to restart, resume, or return to the CRP upon his release from Rapha. At the same time, the record lacks any evidence of a written order from

the GMC indicating that Mr. DuBose's obligation to complete the CRP was no longer a condition of his suspended sentence for his DUI case. CAF.

On September 27, 2011, Mr. DuBose returned to the ECCRP and signed a new color-code agreement and a new CRP case management plan. On May 10, 2012, the ECCRP issued a return to court form notifying the GMC that Mr. DuBose had been terminated from the CRP due to his failure to attend required monitory sessions and his failure to report for color-code drug screens. The form also requested the GMC to set a show cause hearing.

In January of 2013, Mr. DuBose appeared in the GMC and requested to serve out the remainder of his sentence in jail. There are no written orders by the GMC for Mr. DuBose to restart, resume, or return to the CRP after he was terminated multiple times for noncompliance. There are likewise no written probation revocation orders, probation extension orders, or orders extending the suspended sentence from the GMC. At the same time, the record lacks any evidence of a written order from the GMC indicating that Mr. DuBose's obligation to complete the CRP was no longer a condition of his suspended sentence for his DUI case. CAF.

As noted above, Mr. DuBose received a suspended sentence for his DUI case on October 6, 2009. Mr. DuBose maintains that because there are no written revocation or extension orders from the GMC, the statutory maximum period for

probation, suspended sentence, and/or compliance with the CRP for his case expired on October 6, 2011.

Mr. DuBose continued to be subjected to the CRP requirements until, at least, May 20, 2012. After October 6, 2011, he was color-coded at least 21 times, scheduled for at least one monitoring session, required to report to the ECCRP at least four times, called by the ECCRP at least one time, returned to GMC at least once, and required to attend self-help meetings. Mr. DuBose was also required to pay drug-testing fees, monitoring fees, and/or late fees at least ten times. Mr. DuBose maintains that he was also arrested and incarcerated as a direct result of his failure or inability to comply with the CRP requirements after the statutory maximum period had expired.

## **MR. LOYD**

On July 1, 2003, Mr. Loyd appeared before the GMC on two misdemeanor charges (MC03-222 and MC03-223). According to the Order of Suspended Sentence entered by the GMC, Mr. Loyd was sentenced to 30 days in jail, which was suspended, and 24-months of unsupervised probation. Mr. Loyd also was ordered to attend a substance abuse program. Apparently, Mr. Loyd enrolled in the CRP run by the ECCRP for his substance abuse treatment. CAF.

On September 2, 2004, the ECCRP issued a return to court form referencing

only case number MC03-222 and notifying the GMC that Mr. Loyd had been terminated from the CRP for failure to report for color-code drug screens "since he was returned to [it] in July." There are no written orders from the GMC ordering Mr. Loyd to return to the CRP at any time. At the same time, the record lacks any evidence of a written order from the GMC indicating that Mr. Loyd's obligation to complete the CRP was no longer a condition of his suspended sentence for his misdemeanor case(s).[5] CAF.

On September 22, 2009, the ECCRP issued a return to court form notifying the GMC that Mr. Loyd had been terminated from the CRP with respect to case number 09-461, which is an Attalla Municipal Court case. Neither of Mr. Loyd's case numbers pending before the GMC from 2003 are referenced on this typed order, except for a handwritten note on the bottom that reads "11-24-09, GM Ct. 5 days contempt; walk over upon release MC03-222-PI."

In a footnote, Plaintiffs speculate that this handwritten reference to MC03-222-PI indicates that Mr. Loyd was found in contempt by the GMC and ordered to serve 5 days in jail. However, there is no typed contempt order from the GMC pertaining to MC03-222-PI. Additionally, there is no typed order from the GMC requiring Mr.

---

[5]  The record suggests that one of Mr. Loyd's misdemeanor charges–MC03-223–may have been dropped and that the charge in MC03-222 is the only one in which he received a suspended sentence. However, the Court cannot tell for certain from the record what transpired with MC03-223.

Loyd to "walk over upon release," restart, resume, or return to the CRP in either of Mr. Loyd's 2003 GMC cases.

On November 24, 2009, Mr. Loyd was arrested. He was released on November 29, 2009. There are no written orders from the GMC ordering Mr. Loyd to restart, resume, or return to the CRP after this arrest and release from jail. At the same time, the record lacks any evidence of a written order from the GMC indicating that Mr. Loyd's obligation to complete the CRP was no longer a condition of his suspended sentence for his misdemeanor case(s). CAF.

On April 1, 2010, the ECCRP issued a return to court form referencing three case numbers, including MC03-222, and notifying the GMC that Mr. Loyd had been terminated from the CRP for failure to report after his release from jail on March 3, 2010. The form also requested the GMC to issue a warrant for Mr. Loyd's arrest.

On March 1, 2011, there is a notation in Mr. Loyd's ECCRP Case Management Contact Record that he is to "re-enroll per Judge Rhea." This contact record has three case numbers written on the top, including MC03-222. This notation does not clearly indicate for which case or cases Mr. Loyd was ordered to re-enroll. There also is no written order from the GMC for MC03-222 requiring Mr. Loyd to "re-enroll" in the CRP. At the same time, the record lacks any evidence of a written order from the GMC indicating that Mr. Loyd's obligation to complete the CRP was no longer a

condition of his suspended sentence for his misdemeanor case(s). CAF.

On March 14, 2011, Mr. Loyd signed a new color-code agreement with the CRP, but there are no case numbers indicated on the agreement. On November 3, 2011, the ECCRP issued a return to court form referencing two case numbers, including MC03-222, and notifying the GMC that Mr. Loyd had been terminated from the CRP for failure to report for color-code drugs screens. The form also requested the GMC to issue a warrant for Mr. Loyd's arrest.

On February 3, 2012, the ECCRP issued a return to court form, referencing three case numbers, including MC03-222, and notifying the GMC that Mr. Loyd had been terminated from the CRP for his failure to re-enroll after he was released from Attalla City Jail. The form also requested the GMC to issue a warrant for Mr. Loyd's arrest. There are no written court orders in MC03-222 requiring Mr. Loyd to re-enroll in the CRP after an arrest or release from the Attalla City Jail. At the same time, the record lacks any evidence of a written order from the GMC indicating that Mr. Loyd's obligation to complete the CRP was no longer a condition of his suspended sentence for his misdemeanor case(s) upon his release from the Attalla City Jail. CAF.

On March 27, 2012, Mr. Loyd signed a new color-code agreement with the ECCRP. This document lacks any reference to any pending case numbers. On April 13, 2012, the ECCRP noted on a return to court form, referencing MC03-222, that

this case had been closed per Judge King's order. The form was not sent to the GMC.

There are no written orders from the GMC for Mr. Loyd to restart, resume, or return to the CRP after he was terminated for noncompliance with the CRP or arrested and placed in the Attalla City Jail. There are likewise no written probation revocation orders or orders extending the suspended sentence from the GMC. At the same time, the record lacks any evidence of a written order from the GMC indicating that Mr. Loyd's obligation to complete the CRP was no longer a condition of his suspended sentence for his GMC misdemeanor case(s). CAF.

As noted above, Mr. Loyd received a suspended sentence on March 13, 2003. Mr. Loyd maintains that because there are no written revocation or extension orders from the GMC, the statutory maximum term for probation, the suspended sentence, and/or compliance with the CRP expired on March 13, 2005.

Mr. Loyd continued to be subjected to the CRP requirements until his GMC case was closed on April 13, 2012. After March 13, 2005, Mr. Loyd was color-coded at least 18 times, scheduled for at least one evaluation, monitored by the ECCRP at least three times, required to report to the ECCRP at least two times, was called by the ECCRP at least one time, returned to GMC at least twice, and required to attend self-help meetings. Mr. Loyd was also required to pay drug-testing fees, monitoring fees, and/or late fees at least seven times.

# **MR. LYNN**

On January 25, 2007, Mr. Lynn appeared before the GMC on a misdemeanor DUI case (TR06-5143). Mr. Lynn received a 180-day jail sentence, which was suspended, and 24-months of probation. He was also ordered to undergo a substance abuse evaluation by the ECCRP.

On March 13, 2007, the ECCRP issued a return to court form notifying the GMC that Mr. Lynn had been terminated from the CRP because he had failed to report for two color-code drug screens. Ms. Zaner signed this form and requested the GMC to issue a warrant for Mr. Lynn's arrest.

On October 13, 2008, the GMC issued a warrant for Mr. Lynn's arrest. On August 29, 2009, the warrant was executed and Mr. Lynn was arrested. There is an order of contempt stamped on Mr. Lynn's GMC record showing that he was found in contempt and ordered to serve 35 days.

Mr. Lynn served five days in the county jail and on September 1, 2009, he was released to Rapha. Mr. Lynn was released from Rapha on October 23, 2009. Mr. Lynn's "exit information" from Rapha notes that he was supposed to report back to the CRP upon his release from Rapha, but there is no written GMC order to that effect. At the same time, the record lacks any evidence of a written order from the GMC indicating that Mr. Lynn's obligation to complete the CRP was no longer a

condition of his suspended sentence for his DUI case. CAF.

On October 26, 2009, Mr. Lynn signed a new color-code agreement with the ECCRP and, on November 12, 2009, he signed a new case management plan. On March 17, 2010, the ECCRP issued a return to court form notifying the GMC that Mr. Lynn had been terminated from the CRP for failure to report for color-code drug screening. The form, signed by Ms. Zaner, also requested the GMC to issue a warrant for Mr. Lynn's arrest.

On April 12, 2010, the GMC issued a warrant for Mr. Lynn's arrest. The warrant was executed on July 3, 2012, and Mr. Lynn was arrested. Mr. Lynn served two days in jail and was released on July 5, 2012.

On July 12, 2012, Mr. Lynn's case was closed per Judge King's order. There are no written GMC orders for Mr. Lynn to restart, resume, or return to the CRP after he was terminated multiple times for noncompliance. There are likewise no written GMC orders of probation revocation, probation extension, or extensions of the suspended sentence. At the same time, the record lacks any evidence of a written order from the GMC indicating that Mr. Lynn's obligation to complete the CRP was no longer a condition of his suspended sentence for his GMC misdemeanor DUI case. CAF.

As set out above, Mr. Lynn was sentenced on January 25, 2007. Mr. Lynn

maintains that because there are no written revocation or extension orders from the GMC, the statutory maximum period for probation, suspended sentence, and/or compliance with the CRP expired on January 25, 2009. Mr. Lynn continued to be subjected to the ECCRP requirements until his case was closed on July 12, 2012.

After January 25, 2009, Mr. Lynn was color-coded at least eleven times, scheduled for at least one evaluation and three ECCRP monitoring sessions, was called by the ECCRP at least once, required to report to the ECCRP at least twice, and required to attend self-help meetings. Mr. Lynn was also required to pay drug-testing fees, monitoring fees, and/or late fees at least ten times. Mr. Lynn maintains that he was also arrested and incarcerated as a direct result of his failure or inability to comply with the CRP requirements after the statutory maximum period had expired.

### **MR. MYERS**

On March 3, 2006, Mr. Myers was sentenced by the GMC on a misdemeanor charge of minor in possession of alcohol (MC06-0238). Mr. Myers received youthful offender status, a suspended 30-day jail sentence, and was ordered to enroll in the CRP.

On April 17, 2006, the ECCRP issued a return to court form notifying the GMC that Mr. Myers had been terminated from the CRP because he failed to report for his scheduled evaluation appointments. The form is signed by Ms. Zaner and she

requested that the GMC issue a warrant for Mr. Myers's arrest.

On January 20, 2007, Mr. Myers was arrested and ordered to serve five days in jail for contempt. There does not appear to be any written GMC order to re-start or resume the CRP after his release. At the same time, the record lacks any evidence of a written order from the GMC indicating that Mr. Myers's obligation to complete the CRP was no longer a condition of his suspended sentence for his GMC misdemeanor case. CAF.

On September 27, 2007, the ECCRP issued a return to court form notifying the GMC that Mr. Myers had been terminated from the CRP because he failed to report for two color-code drug screens. Ms. Zaner signed the form and requested that the GMC issue a warrant for his arrest. On March 3, 2008, an alias warrant was issued for Mr. Myers. The alias warrant was executed on March 29, 2009, and Mr. Myers was arrested. There do not appear to be any written orders from the GMC for Mr. Myers to restart, resume, or return to the CRP after his termination due to his noncompliance or his arrest and release. At the same time, the record lacks any evidence of a written order from the GMC indicating that Mr. Myers's obligation to complete the CRP was no longer a condition of his suspended sentence for his GMC misdemeanor case. CAF.

On December 1, 2009, the ECCRP issued a return to court form notifying the

GMC that Mr. Myers had been terminated from the CRP because he failed to report for three color-code drug screens. The form also requested that the GMC issue a warrant for his arrest.

On January 15, 2010, a warrant was issued for Mr. Myers's arrest. The warrant was executed and Mr. Myers was arrested on February 11, 2010. He served five days for contempt and was released on February 16, 2010.

On February 11, 2010, an order of contempt was stamped on Mr. Myers's case action summary sheet finding Mr. Myers in contempt of compliance with the CRP and ordering him to serve five days in jail. There does not appear to be a written order from the GMC for Mr. Myers to restart, resume, or return to the CRP following his termination from the CRP or his arrest and release from jail. At the same time, the record lacks any evidence of a written order from the GMC indicating that Mr. Myers's obligation to complete the CRP was no longer a condition of his suspended sentence for his GMC misdemeanor case. CAF.

On March 15, 2010, the ECCRP issued a return to court form notifying the GMC that Mr. Myers has been terminated from the CRP because he failed to report to three color-code drug screens. Ms. Zaner signed this form and she requested that the GMC issue a warrant for Mr. Myers's arrest.

On April 12, 2010, a warrant was issued for Mr. Myers's arrest. The warrant

was executed on April 29, 2010, and Mr. Myers was arrested. He was released from jail on May 9, 2010.

On June 3, 2010, the ECCRP issued a return to court form notifying the GMC that Mr. Myers had been terminated from the CRP because he failed to attend an evaluation appointment and he failed to report for a color-code screening. The form also requested that the GMC issue a warrant for Mr. Myers's arrest. On June 8, 2010, a warrant was issued for Mr. Myers's arrest. On January 22, 2011, the warrant was executed and Mr. Myers was arrested.

On January 25, 2011, an order of contempt was stamped on Mr. Myers's case action summary sheet finding him in contempt of compliance with the CRP and ordering him to serve five days in jail. There does not appear to be a written order from the GMC for Mr. Myers to restart, resume, or return to the CRP. At the same time, the record lacks any evidence of a written order from the GMC indicating that Mr. Myers's obligation to complete the CRP was no longer a condition of his suspended sentence for his GMC misdemeanor case. CAF.

Mr. Myers was released from jail on January 28, 2011. On this date, Mr. Myers was also reactivated in the CRP. On February 15, 2011, the ECCRP issued a return to court form notifying the GMC that Mr. Myers had been terminated from the program because he failed to attend an evaluation. The form also requested that the

GMC issue a warrant for Mr. Myers's arrest.

On March 4, 2011, the GMC issued a warrant for Mr. Myers's arrest. The warrant was executed and Mr. Myers was arrested on the same day. Mr. Myers served 30 days in jail and was released on April 4, 2011.

There does not appear to be any written revocation orders or orders of contempt in this instance. Nor does there appear to be any written order requiring Mr. Myers to restart, resume, or return to the CRP. At the same time, the record lacks any evidence of a written order from the GMC indicating that Mr. Myers's obligation to complete the CRP was no longer a condition of his suspended sentence for his GMC misdemeanor case. CAF.

On April 26, 2011, the ECCRP issued a return to court form notifying the GMC that Mr. Myers had been terminated from the CRP because he failed to attend an evaluation and because he failed to report for three color-code screens. There is a request for the GMC to issue a warrant for Mr. Myers's arrest.

On April 29, 2011, a warrant was issued for Mr. Myers's arrest. On June 27, 2011, the warrant was executed and Mr. Myers was arrested. Mr. Myers was in jail until July 1, 2011, when he was released to Rapha for substance abuse treatment. Mr. Myers stayed there until July 26, 2011.

On July 26, 2011, the day he was released from Rapha, Mr. Myers signed a

new color-code agreement with the ECCRP. Mr. Myers also signed a case management plan with the ECCRP on August 5, 2011. The record does not include any written orders from GMC for Mr. Myers to restart, resume, or return to the CRP. At the same time, the record lacks any evidence of a written order from the GMC indicating that Mr. Myers's obligation to complete the CRP was no longer a condition of his suspended sentence for his GMC misdemeanor case. CAF.

On October 12, 2011, the ECCRP issued a return to court form notifying the GMC that Mr. Myers had been terminated from the CRP because he failed to report for three color-code drug screens. The form requested the GMC to issue a warrant for Mr. Myers's arrest.

There are no GMC written orders for Mr. Myers to restart, resume, or return to the CRP after any of his terminations from the CRP. There are likewise no written probation revocation or extension orders from the GMC. At the same time, the record lacks any evidence of a written order from the GMC indicating that Mr. Myers's obligation to complete the CRP was no longer a condition of his suspended sentence for his GMC misdemeanor case. CAF.

As noted above, Mr. Myers was sentenced on March 3, 2006. Mr. Myers maintains that because there are no written revocation or extension orders from the GMC, the statutory maximum term for probation and/or compliance with the CRP

expired on March 3, 2008. In total, Mr. Myers served well beyond the 30-days in jail he was originally sentenced to, between various contempt orders and the time he served in jail and at Rapha.

Mr. Myers continued to be subjected to the CRP requirements until, at least, October 12, 2011. After March 3, 2008, he was color-coded at least 34 times, scheduled for at least two ECCRP evaluations, monitored by the ECCRP at least four times, required to report to the ECCRP at least seven times, was called by the ECCRP at least two times, returned to GMC at least six times, and required to attend self-help meetings. Mr. Myers maintains he was also required to pay drug-testing fees, monitoring fees, and/or late fees at least thirteen times. Mr. Myers further asserts that he was arrested and incarcerated as a direct result of his failure or inability to comply with the CRP requirements after the statutory maximum period had expired.

## MS. SNOW

On September 13, 2007, Ms. Snow appeared before the GMC on a misdemeanor charge (MC07-1361). She received youthful offender status, a deferred sentence of 12 months, and was ordered to enroll in the CRP.

On October 17, 2007, the ECCRP issued a return to court form notifying the GMC that Ms. Snow had been terminated from the CRP for failure to report to evaluation appointments. The form, signed by Ms. Zaner, also requested the GMC to

"remove the defendant's 'to be dismissed' status" and issue a warrant for her arrest.

On April 14, 2008, the GMC issued a warrant for Ms. Snow's arrest. The warrant was executed and Ms. Snow was arrested on March 15, 2009. Ms. Snow served 17 days in jail and was released on April 2, 2009.

There is no written GMC order requiring Ms. Snow to restart, resume, or return to the CRP after her termination due to noncompliance and release from jail. At the same time, the record lacks any evidence of a written order from the GMC indicating that Ms. Snow's obligation to complete the CRP was no longer a condition of her suspended sentence for her GMC misdemeanor case. CAF.

On June 18, 2009, the ECCRP issued a return to court form notifying the GMC that Ms. Snow had been terminated from the program for her failure to report for color-code drug screening. The form, signed by Ms. Zaner, also requested the GMC to issue a warrant for Ms. Snow's arrest.

On July 23, 2009, the GMC issued a warrant for Ms. Snow's arrest. On March 22, 2010, the warrant was executed and Ms. Snow was arrested. A contempt order was stamped on the GMC record on March 25, 2010, finding Ms. Snow in contempt and ordering her to serve five days in jail. Ms. Snow was released on March 28, 2010.

There is no GMC written order requiring Ms. Snow to restart, resume, or return to the CRP after her termination due to her noncompliance and her release from jail.

At the same time, the record lacks any evidence of a written order from the GMC indicating that Ms. Snow's obligation to complete the CRP was no longer a condition of her suspended sentence for her GMC misdemeanor case. CAF.

On May 3, 2010, the ECCRP issued a return to court form notifying the GMC that Ms. Snow had been terminated from the CRP because she tested positive for marijuana and failed to report to color-code drug screens. The form also requested the GMC to issue a warrant for Ms. Snow's arrest.

On May 20, 2010, the GMC issued a warrant for Ms. Snow's arrest. On June 25, 2010, the warrant was executed and Ms. Snow was arrested. Ms. Snow was released from jail on July 22, 2010. Again, there is no GMC written order requiring Ms. Snow to restart, resume, or return to the CRP after her termination due to noncompliance and/or her release from jail. At the same time, the record lacks any evidence of a written order from the GMC indicating that Ms. Snow's obligation to complete the CRP was no longer a condition of her suspended sentence for her GMC misdemeanor case. CAF.

On August 18, 2010, the ECCRP issued a return to court form notifying the GMC that Ms. Snow had been terminated from the CRP because she failed to report for evaluations and color-code drug screening. The form, signed by Ms. Zaner, also requested the GMC to issue a warrant for Ms. Snow's arrest.

On September 8, 2010, the GMC issued a warrant for Ms. Snow's arrest. On March 3, 2011, the warrant was executed and Ms. Snow was arrested. Ms. Snow served five days and was released from jail on March 8, 2011.

On April 6, 2011, the ECCRP issued a return to court form notifying the GMC that Ms. Snow had been terminated from the CRP because of a positive drug screening and failing to appear for an evaluation. On April 14, 2011, Ms. Snow was arrested in the GMC and was released 15 days later, on April 29, 2011.

On May 16, 2011, the ECCRP issued a return to court form notifying the GMC that Ms. Snow had been terminated from the CRP for failure to attend an evaluation appointment. The form also requested the GMC to issue a warrant for her arrest. The warrant was executed on June 3, 2012, and Ms. Snow was arrested. This time, Ms. Snow served a 180-day sentence and was released on December 1, 2012.

There are no GMC written orders for Ms. Snow to restart, resume, or return to the CRP after being terminated for noncompliance. At the same time, the record lacks any evidence of a written order from the GMC indicating that Ms. Snow's obligation to complete the CRP was no longer a condition of her suspended sentence for her GMC misdemeanor case. CAF.

On September 13, 2007, Ms. Snow received a 12-month deferred prosecution. However, Ms. Snow did not serve her 180-day sentence until five years later. Ms.

Snow maintains that the twenty-four month statutory maximum term for probation, suspended sentences, and/or compliance with the CRP expired on September 13, 2009.

Ms. Snow continued to be subjected to the CRP requirements until June 3, 2012, when she served out the entirety of her sentence. After September 13, 2009, Ms. Snow was color-coded at least 18 times, scheduled for at least three evaluations, required to come to the ECCRP at least seven times, terminated at least five times, and required to attend self-help meetings. Ms. Snow also was required to pay drug-testing fees, monitoring fees, and/or late fees at least eight times. Ms. Snow asserts that she was also arrested and incarcerated a number of times as a direct result of her failure or inability to comply with the ECCRP requirements after the statutory maximum period had expired.

## IV.    PRELIMINARY ISSUES

Before turning to the merits of Defendants' Motion, the Court will first determine which claims Plaintiffs have abandoned and which claims Plaintiffs are still contesting on summary judgment.

### **Plaintiffs' Relevant Claims**

Plaintiffs' third amended and restated complaint has 21 separate counts (asserting both federal and state law claims), 359 paragraphs, and 97 pages. (*See*

*generally* Doc. 63). Expressly referencing Counts One, Seven, and Seventeen (as well as other allegations), Plaintiffs maintain in their opposition to the Motion that "the gravamen of [their] complaint . . . [is that] [Ms.] Zaner and ECCRP routinely restarted each of the plaintiffs on ECCRP requirements without and/or beyond orders to do so and beyond any conceivable statutory maximum allowable by law." (Doc. 163 at 35).

Plaintiffs then attempt to clarify which of their claims they believe are (due to various procedural developments) beyond the scope of Defendants' Motion:

> As a result of the bifurcation of this case from the *Cantrell v. Attalla* case, and in conjunction with the discovery obtained and the arguments made in support of summary judgment, the following counts in Plaintiffs' Third Amended Complaint [Doc. 63] are no longer pertinent to this motion for summary judgment [Doc. 162]: Counts Four, Six, Nine, Ten, Twelve, Thirteen, Fifteen, Sixteen, Nineteen, and Twenty. Similarly, the parties [filed] a joint stipulation of dismissal dismissing the City of Gadsden as a party to this action [Doc. 63], rendering the following counts associated with the City of Gadsden irrelevant to this motion for summary judgment [Doc. 162]: Counts Two, Five, Eight, Eleven, Fourteen, and Eighteen.

(Doc. 163 at 35 n.5).

Based upon the foregoing footnote, the Court (by process of elimination) has identified those counts that Plaintiffs have indicated remain relevant to this Motion.[6] Those five counts (which Plaintiffs omitted from the above summary) are Counts One, Three, Seven, Seventeen, and Twenty-One. However, because Count Three

---

[6] All counts identified by Plaintiffs as "irrelevant" have been abandoned by them.

involves only the Attalla Plaintiffs and the COA (doc. 63 at 46-49 ¶¶ 155-166), this particular count also falls outside the scope of Defendants' Motion, leaving only four counts pursued by these Plaintiffs against these Defendants.

The two federal counts not abandoned by Plaintiffs thus are:[7]

### Plaintiffs' Federal Constitutional Counts[8]

● Count One–Denial of Due Process Under the Fourteenth Amendment by the ECCRP and/or Ms. Zaner in her Personal Capacity Applicable to All Plaintiffs (doc. 63 at 39-43 ¶¶ 129-142);[9] and

---

[7] Plaintiffs claim proximately-caused damages in the last paragraph of each constitutional count:

[L]oss of liberty and injury to dignity by being arrested, incarcerated, and subjected to additional fines, costs, and ECCRP requirements and fees.

(Doc. 63 at 43 ¶ 142; *id.* at 61 ¶ 217).

[8] As this Court explained earlier in the litigation, any federal claims brought against Ms. Zaner in her official capacity are duplicative of those claims brought against the ECCRP. *See, e.g.*, *Busby v. City of Orlando*, 931 F.2d 764, 776 (11th Cir. 1991) ("In contrast to individual capacity suits, when an officer is sued under Section 1983 in his or her official capacity, the suit is simply another way of pleading an action against an entity of which an officer is an agent." (footnote and internal quotation marks omitted) (quoting *Kentucky v. Graham*, 473 U.S. 159, 165 (1985))); *Kentucky*, 473 U.S. at 166-67 ("When it comes to defenses to liability [in a § 1983 action], an official in a personal-capacity action may, depending on his position, be able to assert personal immunity defenses, such as objectively reasonable reliance on existing law."). Therefore, the § 1983 question that remains for Ms. Zaner is to what extent a triable issue exists regarding her personal liability to Plaintiffs for allegedly violating their Fourteenth and Eighth Amendment rights.

[9] The Court notes that Count One of Plaintiffs' third amended and restated complaint contains fleeting references to Plaintiffs' due process rights guaranteed by the Fifth Amendment and Alabama law in addition to the Fourteenth Amendment. (Doc. 63 at 40 ¶ 130). The Fifth Amendment prohibits due process violations by the federal government and, therefore, cannot apply here. While Plaintiffs' allegations potentially trigger Alabama constitutional concerns, Plaintiffs have made no effort to develop any state constitutional theory in their opposition brief. Thus, Plaintiffs have abandoned any comparable state due process claim, and the Court has appropriately focused

30

- Count Seven–Violation of the Eighth Amendment by the ECCRP and/or Ms. Zaner in her Personal Capacity Applicable to All Plaintiffs (*id.* at 58-61 ¶¶ 202-217).[10]

Plaintiffs' remaining counts include:

### State Law Count

- Count Seventeen–Negligent, Reckless and/or Wanton Training and/or Supervision by the ECCRP and/or Ms. Zaner Applicable to All Plaintiffs (*id.* at 87-88 ¶¶ 329-333); and

### Injunctive Count

- Count Twenty-One–Injunctive Relief (*id.* at 93-95 ¶¶ 352-359).

Those counts that Plaintiffs agree are subject to dismissal in light of Defendants' Motion and the prior dismissal of the COG are Counts Two, Four, Five, Eight, Ten, Eleven, Thirteen, Fourteen, Sixteen, Eighteen, and Twenty. Thus, Defendants' Motion is due to be granted as conceded and/or uncontested with respect to Counts Four, Ten, Thirteen, Sixteen, and Twenty. Further, Counts Two, Five, Eight, Eleven, Fourteen, and Eighteen are due to be dismissed in accordance with the

---

upon an evaluation of the Fourteenth Amendment due process part of Count One only.

[10] The Court notes that Count Seven contains a reference to the Alabama Constitution. (Doc. 63 at 58-59 ¶ 206). While Plaintiffs' allegations potentially trigger Alabama constitutional concerns, Plaintiffs have made no effort to pursue any state constitutional theory in their opposition brief. Instead, they only identify cruel and unusual punishment under the Eighth Amendment as a possibly viable claim. Thus, Plaintiffs have abandoned any comparable state constitutional claim, and the Court has appropriately focused upon an evaluation of the Eighth Amendment part of Count Seven only.

previously entered stipulated dismissal as those claims all pertain solely to the COG.

## V.    ANALYSIS

### A.    Plaintiffs' Fourteenth and Eighth Amendment Claims

#### 1.    Plaintiffs have not carried their burden to show a triable claim under either the Fourteenth or Eighth Amendment.

Defendants begin the argument section of their opening brief by pointing to the absence of proof supporting Plaintiffs' alleged constitutional harms:

> In ruling on ECCRP's Motion to Dismiss the Second Amended Complaint, the Court was required to and did "assume the veracity of well-pleaded factual allegations." At summary judgment, however, the Plaintiffs are required to prove their claims by affirmative, substantial evidence. This is a burden that they cannot meet, and a close examination of the evidentiary record reveals a total lack of factual support for Plaintiff[s'] allegations against ECCRP.

(Doc. 162 at 22-23).[11]

Plaintiffs generally respond that Defendants unconstitutionally caused each of them to remain subject to the CRP's requirements beyond the two-year maximum period for misdemeanor probation under Alabama law. As urged in their brief, Defendants "re-enrolled or restarted each Plaintiff in the[] [CRP] on multiple occasions beyond two years from their sentence date and without or in excess of court orders [from the GMC]." (Doc. 163 at 39). Consistent with the Court's preliminary

---

[11]  All page references to Doc. 162 correspond with the Court's CM/ECF numbering system.

issues section, Plaintiffs expressly identify two federal constitutional provisions which they contend Defendants' conduct triggers–the Due Process Clause of the Fourteenth Amendment and cruel and unusual punishment prohibited by the Eighth Amendment. *Id.*

Before evaluating the parties' competing constitutional positions, the Court discusses three Alabama laws that are implicated in this case–Alabama's Mandatory Treatment Act of 1990 (the "AMTA"), Ala. Code §§ 12-23-1–12-23-19, Alabama's Probation Statute (the "APS"), Ala. Code § 15-22-54, and Alabama's Municipal Court Probation Statute (the "AMCPS"), Ala. Code § 12-14-13.

Ala. Code § 12-23-2 describes AMTA's legislative purpose:

> The Legislature finds that the high incidence of crimes which directly involve alcohol and drugs in this state is intolerable; that the problems of alcohol and drug abuse among the citizens of Alabama are extensive and exist at an unacceptable level; that alcohol and/or drug abuse or dependency have been identified as contributing factors in the commission of many crimes; that a concentrated and coordinated state and local effort is needed to address the needs of Alabamians regarding such problems; that a specialized system for screening, evaluating, educating, and rehabilitating defendants convicted of alcohol and drug related offenses is required to address such problems; and that adequate funding should be provided for this purpose. It is therefore the intent of the Legislature:

> To establish a specialized court referral officer program to promote the evaluation, education and rehabilitation of persons whose use or dependency on alcohol or drugs directly or indirectly contributed to the commission of an offense for which they were convicted in state or municipal courts and to establish mandatory alcohol and drug abuse

treatment programs to provide treatment and rehabilitation for these identified offenders.

Ala. Code § 12-23-2 (emphasis added). The ECCRP is a creature of the AMTA. *See* Ala. Code § 12-23-4(a) (describing role of the Administrative Director of Courts in approving "individuals or entities to provide alcohol and drug assessment for courts and to conduct the court referral programs in each court jurisdiction of the state"); Ala. Code § 12-23-4(b) (setting forth duties of court referral officers).

The APS establishes various parameters that apply to probation or suspension of a criminal sentence. The key provision of the APS at issue in this case is § 15-22-54(a):

> (a) The period of probation or suspension of execution of sentence shall be determined by the court and shall not be waived by the defendant, and the period of probation or suspension may be continued, extended, or terminated. However, . . . in no case shall the maximum probation period of a defendant guilty of a misdemeanor exceed two years, nor shall the maximum probation period of a defendant guilty of a felony exceed five years. When the conditions of probation or suspension of sentence are fulfilled, the court shall, by order duly entered on its minutes, discharge the defendant.

Ala. Code § 15-22-54(a) (emphasis added).

The AMCPS provides in full:

> (a) Municipal courts may suspend execution of sentence and place a defendant on probation for varying periods of time, not to exceed two years.

> (b) The court may require such investigations as may be deemed

necessary and desirable to be made by a probation officer or such other suitable person or persons as the court may designate as to the circumstances of the offense and the criminal record, social history and present condition of the defendant.

(c) The court may suspend the execution of sentence and continue the defendant under an existing bond or may require such additional bail as it deems necessary pending the disposition of the application for probation.

(d) The court shall determine and may, at any time, modify the conditions of probation and may require the probationer to comply with the following or any other conditions:

(1) To avoid injurious or vicious habits;

(2) To avoid persons or places of disreputable or harmful character;

(3) To report to the probation officer or other person designated by the judge;

(4) To permit the officer to visit him at his home or elsewhere;

(5) To work faithfully at suitable employment as far as possible;

(6) To remain within a specified area;

(7) To pay the fine and costs imposed or such portions thereof as the judge may determine and in such installments as the judge may direct;

(8) To make reparation or restitution to any aggrieved party for the damage or loss caused by his offense in an amount to be determined by the court; and

(9) <u>To attend defensive driving schools, alcohol countermeasure programs or courses where available and support his dependents to the best of his ability</u>.

(e) The probation or other officer designated by the court shall investigate all cases when directed to do so by the court and report in writing thereon if the court so directs. The officer, if so designated, shall furnish to each probationer released on probation under his supervision a written statement of the conditions of probation and shall instruct the probationer regarding the same. Such officer shall keep informed concerning the conduct and conditions of each person on probation under his supervision by visiting the probationer and requiring reports from the probationer or others and shall report thereon in writing as often as the court may require. Such officer shall use all practicable and suitable methods, not inconsistent with the conditions imposed by the court, to aid and encourage persons on probation and to bring about improvement in their conduct and condition. Such officer shall keep detailed records of his work and shall make such reports in writing as the court may require. The officer so designated shall have, in the execution of his duties, the power to arrest probationers and the same right to execute process as is given by law to peace officers.

(f) All reports, records and data assembled by any probation officer and referred to the court shall be privileged and shall not be available for public inspection except upon order of the court to which the same was referred. All probation reports completed and filed shall be subject to inspection by the defendant or his attorney.

(g) <u>The period of probation or suspension of execution of sentence shall be determined by the court and may exceed the length of the sentence, and such period may be extended a period of two years from date of sentencing</u>.

(h) <u>Upon the satisfactory fulfillment of the conditions of probation or suspension of sentence, the court shall, by order duly entered on the minutes, discharge the defendant</u>.

(i) At any time during the period of probation or suspension of execution

of sentence, <u>the court may issue a warrant and cause the defendant to be arrested for violating any of the conditions of probation or suspension of sentence</u>. Any probation officer with probable cause to believe a probationer has violated the conditions of probation may arrest such probationer without a warrant. In case of an arrest without a warrant, the probation officer shall prepare a written statement setting forth that the probationer has, in his judgment, violated the conditions of probation, and said statement shall be sufficient warrant for having probationers brought forthwith before the court for determination as to probable cause for the charge of probation violation. The court may order detention of the probationer pending further hearing, after which the court may revoke the probation or suspension of sentence and order and adjudge that the sentence be immediately executed.

Ala. Code § 12-14-13 (emphasis added).

Against this backdrop, Plaintiffs premise both of their constitutional claims on the theory that Defendants have violated Alabama law by requiring each of them to remain subject to the CRP's requirements beyond the two-year maximum period applicable to suspended sentences for misdemeanor violations. However, Plaintiffs have not offered <u>any</u> federal case authority in their opposition brief to support Defendants' constitutional liability for either federal claim.[12] Instead, this section of

---

[12] Plaintiffs do reference quoted language from a GMC Policies & Procedures Standing Order <u>entered on July 13, 2016</u>, to support their position. That Standing Order's section governing termination of probation provides in pertinent part that:

The Court may suspend execution of a defendant's sentence and place the defendant on probation for varying periods of time, not to exceed two years. . . .

Regardless of whether a defendant remains in compliance with the conditions of his probation throughout the prescribed term, <u>any period of probation imposed in connection with a sentence entered by the Court shall terminate as a matter of law two years from the date of sentencing</u>.

Plaintiffs' brief focuses upon Defendants' failure to adhere to the requirements of the Alabama Administrative Office of Courts Court Referral Officer Field Manual (the "CROFM") and the AMTA in failing to "check the status of Plaintiffs' probation."[13] (Doc. 163 at 40).

Plaintiffs cite to various parts of the CROFM to show that Defendants had a responsibility to monitor those probationers who were referred to the CRP. (*See* Doc. 167-2 at 17 § II.E ("Reviews sentence and probation requirements with a defendant and monitors participants for compliance, providing follow-up support as necessary."); *id.* at 45 § 5.b ("Check legal status [including] . . . [c]urrent probationary

---

> Any person whose period of probation is terminated as a matter of law two years from the date of sentencing shall, upon such termination, be excused from further compliance with the terms or conditions of his or her probation officer (or other person designated by the judge) in connection with his or her probation.

(Doc. 136-5 at 11-12 (emphasis added)). (**NOTE:** All page references to Doc. 136-5 correspond with the Court's CM/ECF numbering system.)

Plaintiffs do not in any way attempt to explain how a Standing Order entered in state court (well after their constitutional claims had accrued and their lawsuit was filed) can retroactively create a federal interest subject to protection by the Fourteenth or Eighth Amendment. Thus, the Court is not persuaded to rely upon the contents of the GMC Standing Order as adequate authority to establish a cognizable federal claim.

[13] In the fact section of their brief, Plaintiffs cite to ALA. R. CRIM. P. 26.3(a). (Doc. 163 at 8 ¶ 178). This Alabama criminal rule of procedure governs presentence reports and makes no mention of calculating probation terms. Instead, the non-felony subpart states only that "[t]he court may require a presentence report in all cases in which it has either discretion over the penalty to be imposed or authority to suspend execution of the sentence."ALA. R. CRIM. P. 26.3(a)(1). Plaintiffs, once again, make no effort to explain how this non-substantive rule establishes the unlawfulness of Defendants' conduct under either state or federal law.

status[.]")). However, Plaintiffs fail to point to any provision of the CROFM which expressly requires Defendants to calculate the maximum probation period and/or verify the maximum time remaining on a criminal defendant's probation term. (Doc. 163 at 40, 46). Further, Defendants' obligation to confirm the "status designation (juvenile, youthful offender, other)" (doc. 167-2 at 45)[14] of a probationer, is not the equivalent of a duty to track that person's maximum probation period. Nor does language requiring Defendants to check the legal status of a probationer straightforwardly signify such a duty. (*id.* at 45-46 § 5.a-c).

In fact, at the end of the "**MONITORING PROCEDURE**" section, the CROFM states:

> Once the defendant has successfully completed all monitoring sessions, a certificate of completion should be issued, and the court should be formally notified of completion. The court copy (canary) of the OTC [Order To Complete] or a copy of the certificate of completion may be used as the formal notification of successfully completing the Court Referral Program.

(Doc. 167-2 at 46). Thus, the CROFM makes no reference to any requirement that completion of the CRP must occur within a probationer's maximum probation period.

Likewise, when Ms. Zaner was asked during her deposition if she had "any responsibility to monitor the length of time that someone is – one of your clients,

_____

[14] All page references to Doc. 167-2 correspond with the Court's CM/ECF numbering system.

municipal court defendants, is involved in probation?" (doc. 141-7 at 20 at 79),[15] she responded, "I don't know how I could properly monitor that." *Id.* Ms. Zaner also stated, "I'm assuming it's the same for everyone <u>unless you take into account the tolling period</u>. I mean, I don't know about all that." (*Id.* at 80 (emphasis added)); *id.* (Ms. Zaner's stating that "I don't think I'm qualified [to make that calculation].")). Thus, neither the CROFM nor Ms. Zaner's testimony establishes that Defendants disregarded an express duty to track a probationer's maximum probation period.

Further, the Court has been unable to locate where the AMTA imposes such an express obligation on court referral officers. (*See* Doc. 163 at 40 (citing to Ala. Code § 12-2[3]-2, *et seq.*)). Section 12-23-7 of the AMTA mentions probation, but does not mandate that court referral officers keep track of a defendant's maximum probation term. Finally, Plaintiffs' citation to Ala. Code § 12-14-1 as support (doc. 163 at 40) appears to be a mistake, as that section does not even mention probation and, instead, pertains to the establishment and jurisdiction of Alabama municipal courts. Thus, Plaintiffs have failed to establish that Defendants had a duty to track Plaintiffs' maximum probation periods under Alabama law.

However, even when accepting that the AMTA (or another statute) makes

---

[15] The first page references to Doc. 141-7 correspond with the Court's CM/ECF numbering system.

Defendants responsible for ensuring compliance with the maximum probation term, Plaintiffs still have not demonstrated why that matters from a federal constitutional standpoint. "To obtain relief under 42 U.S.C. § 1983, [Plaintiffs] must show (1) that [Defendants] deprived [them] of a right secured under the Constitution or federal law and (2) that the deprivation occurred under color of state law."[16] *Willis v. Univ. Health Servs., Inc.*, 993 F.2d 837, 840 (11th Cir. 1993) (emphasis added) (citing *Sims v. Jefferson Downs Racing Assoc., Inc.*, 778 F.2d 1068, 1076 (5th Cir. 1985)). Thus, assuming that Plaintiffs are correct that Defendants violated a statutory duty to track their probation terms, the Court nevertheless finds that Plaintiffs' attempt to show a triable due process or cruel and unusual punishment claim fails. In the absence of referencing a federal case (factually comparable to theirs) in which either constitutional right was recognized, or at least listing what elements support either of their constitutional counts along with identifying any corresponding proof that a

---

[16] Here, Plaintiffs claim that the nexus/joint action test (through Defendants' relationship with the AMTA and the Administrative Office of Courts) provides the necessary state-actor link for § 1983. (*See* Doc. 163 at 42 (citing *Willis v. Univ. Health Servs., Inc.*, 993 F.2d 837 (11th Cir. 1993)); *see also Willis*, 993 F.2d at 840 ("The nexus/joint action test applies where 'the state has so far insinuated itself into a position of interdependence with the [private party] that it was a joint participant in the enterprise.'" (quoting *National Broadcasting Co., Inc. v. Communications Workers of America, AFL–CIO*, 860 F.2d 1022, 1026-27 (11th Cir. 1988))). Defendants (who are private parties) have not contested the presence of cognizable state action pursuant to § 1983 under this test. (*See generally* Doc. 172 (mentioning nothing about Plaintiffs' inability to show state action in Defendants' reply)); *see also Filarsky v. Delia*, 566 U.S. 377, 383 (2012) ("Anyone whose conduct is 'fairly attributable to the state' can be sued as a state actor under § 1983." (quoting *Lugar v. Edmondson Oil Co.*, 457 U.S. 922, 937 (1982))).

reasonable jury could consider, Plaintiffs' federal claims are fatally underdeveloped. *Cf. Flanigan's Enters., Inc. v. Fulton County*, 242 F.3d 976, 987 n.16 (11th Cir. 2001) (holding that a party waives an argument if the party "fail[s] to elaborate or provide any citation of authority in support" of the argument), *superceded on other grounds by county ordinance as stated in Buehrle v. City of Key W.*, 813 F.3d 973, 980 n.3 (11th Cir. 2015); *Ordower v. Feldman*, 826 F.2d 1569, 1576 (7th Cir. 1987) (stating that an argument made without citation to authority is insufficient to raise an issue before the court).

As the Court observed during the pleadings stage:

> In redrafting, <u>the court encourages Plaintiffs to refer to pattern jury charges</u> as a way to streamline their allegations and reduce the scope of their currently cumbersome complaint into a more manageable and plausible pleading. Plaintiffs are **HEREBY CAUTIONED** that their failure to replead in a concise and meaningful manner may result in the dismissal of one or more of their claims with or without prejudice.

(Doc. 62 at 37 (emphasis by underlining added)). Despite the Court's early instruction to focus on fundamentals, Plaintiffs' opposition still lacks legal clarity as to why their facts present a <u>federal constitutional case</u>. In fact, reading Plaintiffs' brief reminds this Court of the first two lines of Buffalo Springfield's "For What It's Worth": "There's something happening here[.] But what it is ain't exactly clear[.]"[17] When a

---

[17] *See* https://www.azlyrics.com/lyrics/buffalospringfield/forwhatitsworth.html.

defendant argues that a claim is factually and/or legally insufficient on summary judgment, it is the plaintiff's job, as the non-movant, to make it clear to the Court why a <u>triable</u> claim does, in fact, exist. Scrutiny through a Rule 56 lens typically demands much more from a plaintiff than a showing of Rule 12(b)(6) plausibility; an unclearly developed claim is <u>not</u> a triable one. Here, Plaintiffs' nebulous efforts do not satisfy their Rule 56 burden to show how their facts, if proven to a jury, constitute a cognizable claim under either the Fourteenth or the Eighth Amendment. Accordingly, Defendants' Motion is due to be granted as to Counts One and Seven in light of Plaintiffs' failure to carry their burden as the non-movants.[18]

### 2. Plaintiffs' constitutional claims also fail because they have not demonstrated that their probation terms violated state law.

According to Plaintiffs, the overall key to Defendants' liability is that Plaintiffs were subject to non-custodial supervision through the CRP for longer than the two-year statutory maximum as provided for by the APS and the AMCPS. (Doc. 163 at 35). Although Plaintiffs have not pointed to any case authority that supports either one of their constitutional theories, the Court has located a few cases that shed some light as it pertains to their Fourteenth Amendment count.

---

[18] The foregoing analysis also supports a dismissal of any purported state constitutional claims that Plaintiffs have superficially alleged in Counts One and Seven.

"The Fourteenth Amendment provides that '[n]o State shall ... deprive any person of life, liberty, or property, <u>without due process of law</u>; nor deny to any person within its jurisdiction the equal protection of the laws.'" *Holt v. Glenn*, 361 F. App'x 75, 77 (11th Cir. 2010) (emphasis added) (quoting U.S. Const., Amend. XIV § 1). In *United States v. Cornwell*, 625 F.2d 686 (5th Cir. 1980),[19] a probationer "assert[ed] that the court's extension of his probation period, without notice or a hearing, constitute[d] a denial of due process." *Id.* at 687. As legal support, the probationer relied upon *Gagnon v. Scarpelli*, 411 U.S. 778 (1973). *Id.* The Supreme Court ruled in *Gagnon* that "a probationer is entitled to notice and a hearing when a petition is filed to revoke his probation." *Cornwell*, 625 F.2d at 687 (citing *Gagnon*, 411 U.S. at 782).

As the *Cornwell* court explained the Supreme Court's reasoning in *Gagnon*:

> The Supreme Court, in requiring hearings in connection with probation revocations, relied upon its earlier decision in *Morrissey v. Brewer*, 408 U.S. 471, 92 S. Ct. 2593, 33 L. Ed. 2d 484 (1972). In that case, the Court held that the due process clause requires that an individual on parole be afforded a hearing before his parole is revoked. In determining whether the nature of the parolee's interest was within the Fourteenth Amendment protection of liberty or property, the court stated:
>
> > The parolee has been released from prison based on

---

[19]  In *Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc), the Eleventh Circuit adopted as binding precedent all decisions of the former Fifth Circuit handed down prior to October 1, 1981.

an evaluation that he shows reasonable promise of being able to return to society and function as a responsible, self-reliant person. Subject to the conditions of his parole, he can be gainfully employed and is free to be with family and friends and to form the other enduring attachments of normal life. Though the State properly subjects him to many restrictions not applicable to other citizens, his condition is very different from that of confinement in a prison. He may have been on parole for a number of years and may be living a relatively normal life at the time he is faced with revocation. The parolee has relied on at least an implicit promise that parole will be revoked only if he fails to live up to the parole conditions. In many cases, the parolee faces lengthy incarceration if his parole is revoked.

We see, therefore, that the liberty of a parolee, although indeterminate, includes many of the core values of unqualified liberty and its termination inflicts a "grievous loss" on the parolee and often on others. (footnotes omitted.)

*Id.* at 482, 92 S. Ct. at 2600. Subsequently, in *Gagnon v. Scarpelli*, *supra*, the Court held that the same guarantee of due process applies to revocations of probation, since revocation of probation results in the same loss of liberty.

*Cornwell*, 625 F.2d at 688.

The *Cornwell* court further explained that "[t]he Supreme Court has not considered whether due process requires that an individual on probation be afforded an opportunity to be heard when his probation is extended[.]" *Id.* After discussing the decisions by the Third and Eighth Circuits that "rejected claims of a due process right to a hearing in probation extensions[,]" the former Fifth Circuit held "that extension

of a 'non-custodial period of supervision to a term <u>within the statutory limits</u> [does not] implicate a liberty interest sufficient to require a preextension hearing as a constitutionally commanded right.'" *Id.* (emphasis added) (quoting *United States v. Carey*, 565 F.2d 545, 547 (8th Cir. 1977)); *Cornwell*, 625 F.2d at 688 ("The nature of the interest and the loss resulting from extension simply do not parallel the fundamental nature of the interest or the seriousness of the loss involved in *Morrissey* and *Gagnon*.").[20]

An arguably implicit holding of *Cornwell* is that an extension of a non-custodial period of supervision to a term <u>beyond</u> the statutory limits does (at least potentially) implicate a cognizable federal liberty interest. *Cf. also Ray v. Judicial Correction Services*, No. 2:12-CV-2819-RDP, Doc. 626 at 62 (N.D. Ala. Sept. 12, 2017) (concluding, based upon and *Cornwell* and *Calhoun v. N.Y. State Div. of Parole Officers*, 999 F.2d 647 (2d. Cir. 1993), that "a reasonable jury could find that JCS unconstitutionally extended Plaintiffs' . . . probation sentences beyond the statutory maximum <u>without providing any notice</u> to Plaintiffs of the extension or any opportunity for a hearing") (emphasis added).[21] However, it is significant that in these

---

[20] Although the *Cornwell* court found no due process violation, it nevertheless held "that district courts shall hereafter provide notice to probationers of proposed extensions and advise probationers that they have a right to a hearing before the court acts." 625 F.2d at 689.

[21] The scope of services provided by JCS as described in the *Ray* case is much broader than the duties of Defendants here. More specifically, "JCS conducted many administrative and judicial

46

cases the potentially unconstitutional act is <u>not</u> extension of probation; rather, it is <u>lack of notice</u> prior to such extension.

Therefore, at least as it pertains to their Fourteenth Amendment count, Plaintiffs may have a viable due process claim if they can show that their non-custodial period of supervision by Defendants cannot legally exceed two years under the AMTA (by reconciling it with the APS and the AMCPS) and that a reasonable jury could conclude that Defendants' supervision of them under the CRP did, in fact, exceed that time period <u>without any notice or an opportunity to be heard</u>.

As to the first issue, Defendants point out that no court has held that a criminal defendant's compliance with the AMTA is subject to a two-year limitation like other conditions of probation. Plaintiffs do not deal with this point directly. Rather, they proceed as if a two-year limitation on compliance with the AMTA is an express statutory provision (which it is not). Nonetheless, even if this Court assumes that the AMTA must be read in conjunction with the APS and the AMCPS and is, consequently, subject to a two-year limitation, Plaintiffs' Fourteenth Amendment due process claim (and also any arguable Eighth Amendment claim) still fails.

---

functions of the municipal court" (*Ray*, doc. 626 at 4 (internal quotation marks omitted)), and allegedly violated due process rights by "the imposition of term of probation exceeding two years[.]" (*Id.* at 5). Additionally, the most current operative complaint in *Ray* does not reference the AMTA as an underlying statute applicable to Plaintiffs' claims. (*See generally Ray*, Doc. 305 (Plaintiffs' Fourth Amended and Restated Complaint) (N.D. Ala. Feb. 1, 2016)).

In *Owens v. State*, 728 So. 2d 673 (Ala. Crim. App. 1998), a probationer filed a habeas petition that challenged "the district court's revocation of his probation" on the basis of the APS's two-year limitation. *Id.* at 674, 675. The probationer's criminal court history in *Owens* is strikingly comparable to those of Plaintiffs. The probationer had pled guilty to a misdemeanor offense on July 22, 1993, and "[h]e was sentenced to 12 months' imprisonment for each conviction, the sentences to run consecutively." *Id.* "The district court suspended the sentences, and placed the appellant on two years' probation on the condition that he pay fines, costs, remuneration to the Crime Victims Compensation Fund, and restitution, and that he attend a school for offenders who have negotiated worthless instruments ("NWNI School")." *Id.* "The district court ordered the appellant to begin making payments on September 1, 1993." *Id.*

Subsequently, the district court determined that the probationer was not in compliance with the terms of his probation and issued warrants for his arrest. *Id.* Those warrants were not executed until September 21, 1995. *Id.* On October 25, 1995, over two years after his original sentence, "the district court revoked the appellant's probation because he failed to pay the court-ordered assessments and because he did not attend NWNI School." *Id.* Rather than putting the probationer in jail, "the district court suspended its revocation order and added more conditions to his probation . . . ." *Id.*

The probationer subsequently failed to meet the terms of this new order and he was served with an arrest warrant on July 2, 1997. *Id.* On July 22, 1997, <u>four years after the probationer's original sentence</u>, the district court held "a revocation hearing, apparently revoking the appellant's probation and ordering the appellant to 'serve out' his fines and costs in jail at the rate of $15 per day." *Id.*

The probationer claimed in his habeas petition that "the district court did not have jurisdiction to revoke his probation because . . . his probationary term had expired at the time of the July 22, 1997, revocation order." *Id.* at 675. In reaching that jurisdictional issue, the Alabama Criminal Court of Appeals, after examining several different cases, defined "maximum probation period" to mean:

> From our examination of the above cases, it is apparent that the "maximum probationary period" a defendant can serve is no more than a total of two years on probation for a misdemeanor conviction and a total of five years on probation for a felony conviction. The trial court retains jurisdiction to revoke a defendant's probation if the revocation proceedings are instigated during the actual court-ordered probationary period, or before the end of the maximum statutorily allowed period. <u>The issuance of an arrest warrant is sufficient to initiate revocation proceedings and to toll the running of the probation period</u>.

*Id.* at 678 (emphasis added).

In overruling a prior APS case, the *Owens* court further clarified:

> We also disagree with the majority's apparent holding in *Miller* that actual incarceration of a delinquent probationer is necessary to toll the probation period—the majority determined that Miller's initial arrest was not sufficient to toll the running of the probationary period because

Miller was not incarcerated, but rather his probation was reinstated at that point. This is contrary to the cases that preceded *Miller*. Moreover, § 15-22-54(d)(1) gives the trial court a number of options when a probationer is delinquent—arrest is not the only option. <u>We will not place the trial court in the untenable position of having to incarcerate a probationer simply to avoid losing jurisdiction</u>.

Accordingly, <u>we overrule our holding in *Miller*, and the cases cited therein, to the extent that it implies that the maximum probation period can never exceed two years from the date of sentencing for a misdemeanor offense</u> and five years from the date of sentencing for a felony offense. In addition, we overrule our holding in *Miller*, however implicit, that the "overt act" necessary to toll the running of the probation period can be no less than the actual incarceration of a delinquent probationer. <u>As set out in § 15-22-54 and the pre-*Miller* cases, there are several alternative methods by which probation revocation proceedings can be initiated that will toll the running of the probation period</u>.

*Owens*, 728 So. 2d at 679-680 (emphasis added).

After undergoing this analysis, the *Owens* court determined that the district court still had jurisdiction over the probationer when his probation was revoked. *Id.* at 680. More specifically, as a result of the multiple intervening tolling periods, he "had served approximately 18 1/2 months of the original 24-month probation." *Id.* Consequently, the probationer's habeas petition was denied.

Here, Plaintiffs do not ever acknowledge the tolling aspect of their maximum probation periods, and fail to factor in the multiple times in which the GMC issued warrants for their arrest and/or Defendants sent return to court forms out for their multiple violations of the CRP. *Cf.* Ala. Code § 12-23-8 ("Compliance with any order

50

authorized pursuant to this chapter relating to education and/or treatment may be enforced by the court <u>through exercise of its contempt powers</u>; or, where made a condition of probation, <u>by revocation thereof for non-compliance</u>.") (emphasis added). Instead, Plaintiffs simplistically add two years to the date of their respective suspended sentences and maintain that Defendants have violated state law because Plaintiffs were still subject to the CRP requirements after that two-year lapse in time.

As *Owens* reveals, however, Plaintiffs' approach to calculating the maximum probation period under the APS and the AMCPS is substantively wrong. Further, it is not this Court's responsibility to figure out the proper calculation for each one of them. Instead, the burden is on Plaintiffs to come forward with evidence and authority establishing both factually and legally why tolling of their maximum probation periods by the GMC is not an issue for them.[22] Plaintiffs have failed to do either. Thus, the Motion is due to be granted on Plaintiffs' Counts One and Seven for the alternative reason that Plaintiffs have not shown that their time spent in the CRP exceeded the two-year limitation for misdemeanor probation.[23]

---

[22] The Court acknowledges that the *Ray* court found that a triable issue as to tolling prevented summary judgment for JCS regarding due process. (*Ray*, Doc. 626 at 63). However in *Ray*, "a reasonable jury could find from the summary judgment record that JCS invariably recalculated probation following purported reinstatements by extending the sentence 24 months from the reinstatement date." *Id.* That caliber of evidence does not exist in this case.

[23] The foregoing analysis also supports a dismissal of any purported state constitutional claims that Plaintiffs have superficially alleged in Counts One and Seven.

### 3. Plaintiffs' constitutional counts alternatively fail for lack of causation.

In *Kentucky*, the Supreme Court summarized the element of causation in a § 1983 action:

> On the merits, to establish personal liability in a § 1983 action, it is enough to show that the official, acting under color of state law, caused the deprivation of a federal right. *See, e.g.*, *Monroe v. Pape*, 365 U.S. 167, 81 S. Ct. 473, 5 L. Ed. 2d 492 (1961). More is required in an official-capacity action, however, for a governmental entity is liable under § 1983 only when the entity itself is a " 'moving force' " behind the deprivation, *Polk County v. Dodson*, 454 U.S. 312, 326, 102 S. Ct. 445, 454, 70 L. Ed. 2d 509 (1981) (quoting *Monell, supra*, 436 U.S., at 694, 98 S. Ct., at 2037); thus, in an official-capacity suit the entity's "policy or custom" must have played a part in the violation of federal law.

473 U.S. at 166;[24] *see also Zatler v. Wainwright*, 802 F.2d 397, 401 (11th Cir. 1986) ("[S]ection 1983 requires proof of an affirmative causal connection between the official's acts or omissions and the alleged constitutional deprivation."). Here, no reasonable jury could conclude that Ms. Zaner caused Plaintiffs a deprivation under the Fourteenth or Eighth Amendment, much less that Ms. Zaner or the ECCRP was the moving force behind such violation(s).

Unlike the situation in *Ray*, Plaintiffs have pointed to no evidence that Defendants affirmatively "extended . . . probation sentences for earlier charges by 24

---

[24] In *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 663 (1978), the Supreme Court overruled *Monroe* "insofar as it holds that local governments are wholly immune from suit under § 1983."

months when the Municipal Court actually issued probation orders in different case."

(*Ray*, Doc. 626 at 62). There also are no written orders from the GMC discharging Plaintiffs from probation or indicating that they were not required to complete the CRP. Consequently, there is no evidence that Defendants deviated from the GMC's orders by requiring Plaintiffs to participate in the CRP after the GMC had discharged them from probation, discharged them from the CRP, and/or closed their misdemeanor cases. Yet, the burden of proof is on Plaintiffs to prove each element of their claims. (*Cf. Ray*, Doc. 626 at 62-63 ("Nothing in the Rule 56 record indicates that JCS employees informed [the plaintiffs] of these modifications to their 2009 and 2011 probation sentences. Nor does the record reflect that the Municipal Court agreed to these modifications.")).

Unlike *Ray*, the record here lacks documentary evidence that Defendants "invariably recalculated probation following purported reinstatements by extending the sentence [of] 24 months from the reinstatement date." (*Ray*, Doc. 626 at 63). The record further lacks evidence that the GMC ever relied upon Defendants to provide probation period calculations, much less that Defendants had policies governing how to make those determinations. (*Cf. Ray*, Doc. 626 at 64 ("These JCS policies instructed employees to extend the length of probation cases until all amounts owed were paid, prevented probation terms from running consecutively, and <u>granted</u>

considerable discretion to JCS employees to determine the amount of time left on a reinstated probation case.") (emphasis added)).

Plaintiffs are correct that their GMC files do not contain written orders returning them to the CRP (after termination for non-compliance). Ms. Zaner has testified that the GMC would indicate this orally in open court. (*See, e.g.*, Doc. 141-8 at 12 at 328 ("When they reappear in court, they would have to restart CRO,[25] the order by the judge to restart. I'm not allowed to accept them back into the program unless the judge orders them back into the program. . . . Q. And you're going by based on what you hear in the courtroom as compared to what is actually written down on the order sheet? A. Correct.")).[26] Plaintiffs have not refuted Ms. Zaner's testimony[27] nor otherwise shown that it was somehow unlawful–under either federal or Alabama law–for Defendants to rely upon only an oral order from the GMC about a probationer's need to continue treatment pursuant to the CRP. While Plaintiffs certainly have shown a lack of detail with Defendants' paperwork, such imperfection

---

[25] "CRO" stands for court referral order.

[26] The first page references to Doc. 141-8 correspond with the Court's CM/ECF numbering system.

[27] The Court acknowledges Plaintiffs' assertion that certain portions of Ms. Zaner's testimony are hearsay and should be stricken. (*See, e.g.*, Doc. 163 at 8 ¶ 180). However, Plaintiffs never filed a separate motion to strike Ms. Zaner's testimony nor otherwise developed their hearsay objection. Accordingly, any request by Plaintiffs to disregard Ms. Zaner's testimony about oral orders from the GMC pertaining to Plaintiffs' obligation to continue with the CRP is denied as undeveloped.

(without more) falls short of establishing a causal connection to any due process injury or Eighth Amendment harm.

Instead, the only conceivable entity that caused Plaintiffs to be subject to the CRP beyond the statutory maximum period (if in fact any of them were so subject after factoring in the APS/AMCPS's tolling framework) without prior notice or an opportunity to be heard was <u>non-party GMC</u>. Further, to the extent that Plaintiffs believed that the GMC was unlawfully continuing its jurisdiction over them by returning them to the CRP beyond their applicable statutory maximum period, then redress was available through a motion asking the GMC to enter an order of discharge or to review the amount of time remaining under the maximum probation term. Importantly, both the APS and the AMCPS provide that the only entity with the power to discharge a person from probation is the court with jurisdiction over that probationer. *See* Ala. Code § 15-22-54(a) ("When the conditions of probation or suspension of sentence are fulfilled, the court shall, by order duly entered on its minutes, discharge the defendant."); Ala. Code § 12-14-13(h) ("Upon the satisfactory fulfillment of the conditions of probation or suspension of sentence, the court shall, by order duly entered on the minutes, discharge the defendant.").

Plaintiffs also could have brought a habeas challenge, which apparently at least one Plaintiff–Ms. Snow–attempted (unsuccessfully) to do. (Doc. 172 at 6).

Regardless, Plaintiffs have failed to present proof from which a reasonable jury could conclude that <u>Defendants caused or were the moving force behind</u> extending Plaintiffs' probationary term (through continuation of the CRP) beyond the state statutory maximum without prior notice and an opportunity to be heard. Thus, the Motion is due to be granted as to Counts One and Seven due to the absence of a triable issue of § 1983 causation against these Defendants.

### 4. Ms. Zaner is additionally entitled to qualified immunity.

Defendants have also raised the defense of qualified immunity. Defendants indicate that both the ECCRP and Ms. Zaner may rely on this doctrine. (*See* Doc. 162 at 34 (discussing qualified immunity afforded to a private attorney)); (*see generally* Doc. 140). The ECCRP has no individual capacity. Further, the Supreme Court has held "that [a] municipality may not assert the good faith of its officers or agents as a defense to liability under § 1983." *Owen v. City of Indep.*, 445 U.S. 622, 638 (1980). The *Owen* Court further clarified in a footnote that a municipality (unlike an individual) has only one capacity under § 1983:

> The governmental immunity at issue in the present case differs significantly from the official immunities involved in our previous decisions. In those cases, <u>various government officers had been sued in their individual capacities, and the immunity served to insulate them from personal liability for damages.</u> Here, in contrast, <u>only the liability of the municipality itself is at issue,</u> not that of its officers, and in the absence of an immunity, <u>any recovery would come from public funds.</u>

*Id.* n.18 (emphasis added).

After studying *Owen*, and in the absence of any controlling contrary authorities relied upon by Defendants, the Court sees no reason why a private entity such as the ECCRP should be afforded greater protection from liability under § 1983 than a municipality. Therefore the Court agrees with Plaintiffs that, by extension of *Owen*, the ECCRP cannot benefit from asserting an immunity defense based upon the absence of any violation of clearly established law and/or the good faith conduct of Ms. Zaner.

However, Ms. Zaner (to the extent that she should be afforded the same immunity protections as a public official)[28] can appropriately assert a qualified

---

[28]   In *Richardson v. McKnight*, 521 U.S. 399 (1997), the Supreme Court determined that private prison guards were not entitled to assert a qualified immunity defense to alleged liability brought against them under § 1983:

> Our examination of history and purpose thus reveals nothing special enough about the job or about its organizational structure that would warrant providing these private prison guards with a governmental immunity. The job is one that private industry might, or might not, perform; and which history shows private firms did sometimes perform without relevant immunities. The organizational structure is one subject to the ordinary competitive pressures that normally help private firms adjust their behavior in response to the incentives that tort suits provide-pressures not necessarily present in government departments. Since there are no special reasons significantly favoring an extension of governmental immunity, and since *Wyatt* makes clear that private actors are not *automatically* immune (*i.e.*, § 1983 immunity does not automatically follow § 1983 liability), we must conclude that private prison guards, <u>unlike those who work directly for the government</u>, do not enjoy immunity from suit in a § 1983 case. *Cf. Forrester v. White*, 484 U.S., at 224, 108 S. Ct., at 542 (Officers "who seek exemption from personal liability have the burden of showing that such an exemption is justified"); *see also Butz*, 438 U.S., at 506, 98 S. Ct., at 2910-2911.

immunity defense. "The defense of qualified immunity completely protects government officials performing discretionary functions from suit in their individual capacities unless their conduct violates 'clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Cottone v. Jenne*, 326 F.3d 1352, 1357 (11th Cir. 2003) (internal quotation marks omitted) (quoting *Gonzalez v. Reno*, 325 F.3d 1228, 1233 (11th Cir. 2003)). "To receive qualified immunity, a government official first must prove that he was acting within his discretionary authority." *Id*.

This is a two-part test. Under the first step, "the defendant must [prove that he or she was] performing a function that, but for the alleged constitutional infirmity, would have fallen within his legitimate job description." *Holloman ex rel. Holloman*

---

*Richardson*, 521 U.S. at 412 (emphasis by underlining added). *Richardson* did not reach whether the prison guards could be held liable under § 1983 "even though they are employed by a private firm." *Id.* at 413. Instead, the Supreme Court instructed that it was "for the District Court to determine whether, under this Court's decision in *Lugar v. Edmondson Oil Co.*, 457 U.S. 922, 102 S. Ct. 2744, 73 L. Ed. 2d 482 (1982), defendants actually acted 'under color of state law.'" *Richardson*, 521 U.S. at 413. In contrast to *Richardson*, the Supreme Court found in *Filarsky* that a private attorney retained to assist in the investigation of a municipal employee's potential wrongdoing was entitled to qualified immunity for any alleged liability within the scope of that role. 566 U.S. at 393-94.

The parties have not cited to any controlling authority that addresses the availability of a qualified immunity defense to a private court referral officer. However, Defendants also have not argued that Ms. Zaner is not subject to suit under § 1983. *See Lugar*, 457 U.S. at 937 (observing that when a private party is sued under § 1983 "the conduct allegedly causing the deprivation of a federal right [must] be fairly attributable to the State" and discussing "a two-part approach to this question of 'fair attribution'"). For the purposes of this underlined alternative basis in support of summary judgment, the Court has assumed that Ms. Zaner can be sued under § 1983 and also can assert a qualified immunity defense but acknowledges, given her private status, the debatable nature of these open questions.

*v. Harland*, 370 F.3d 1252, 1266 (11th Cir. 2004). Next, the defendant must prove that he or she was "executing that job-related function[.]" *Id.* at 1267. "Once a defendant establishes that he was acting within his discretionary authority, the burden shifts to the plaintiff to show that the defendant is not entitled to qualified immunity." *Cottone*, 326 F.3d at 1358.

Until 2009, the Supreme Court had required a two-part inquiry to determine the applicability of qualified immunity, as established by *Saucier v. Katz*, 533 U.S. 194, 201 (2001), *modified in application by Pearson v. Callahan*, 555 U.S. 223, 227 (2009) (holding that "*Saucier* procedure should not be regarded as an inflexible requirement"). Under the *Saucier* test, "[t]he threshold inquiry a court must undertake in a qualified immunity analysis is whether [the] plaintiff's allegations, if true, establish a constitutional violation." *Hope v. Pelzer*, 536 U.S. 730, 736 (2002).

If, under the plaintiff's allegations, the defendants would have violated a constitutional right, "the next, sequential step is to ask whether the right was clearly established." *Cottone*, 326 F.3d at 1358 (quoting *Saucier*, 533 U.S. at 201). The "clearly established" requirement is designed to assure that officers have fair notice of the conduct which is proscribed. *Hope*, 536 U.S. at 739. This second inquiry ensures "that before they are subjected to suit, officers are on notice their conduct is unlawful." *Saucier*, 533 U.S. at 206.

The "unlawfulness must be apparent" under preexisting law.[29] *Anderson v. Creighton*, 483 U.S. 635, 640 (1987) (citing *Malley v. Briggs*, 475 U.S. 335, 344-45, (1986)). Therefore, a temporal requirement exists related to this inquiry. More particularly, a plaintiff must show that a reasonable state actor would not have believed her actions to be lawful in light of law that was clearly established at the time of the purported violation. *See Anderson*, 483 U.S. at 639 ("[W]hether an official protected by qualified immunity may be held personally liable for an allegedly unlawful official action generally turns on the 'objective legal reasonableness' of the action[,] assessed in light of the legal rules that were 'clearly established' <u>at the time it was taken</u>[.]") (emphasis added) (citation omitted); *Brosseau v. Haugen*, 543 U.S. 194, 198 (2004) ("If the law <u>at that time</u> did not clearly establish that the officer's conduct would violate the Constitution, the officer should not be subject to liability or, indeed, even the burdens of litigation.") (emphasis added); *Brosseau*, 543 U.S. at 198 ("Because the focus is on whether the officer had fair notice that her conduct was unlawful, reasonableness is judged against the backdrop of the law <u>at the time</u> of the conduct.") (emphasis added); *see also Johnson v. Clifton*, 74 F.3d 1087, 1093 (11th

---

[29]  Only Supreme Court, Eleventh Circuit, and Alabama Supreme Court cases can "clearly establish" the law in this case. *See Thomas v. Roberts*, 323 F.3d 950, 953 (11th Cir. 2003) ("In this circuit, rights are 'clearly established' by decisions of the Supreme Court, this court, or the highest court of the state in which the case arose." (citing *Hamilton v. Cannon*, 80 F.3d 1525, 1532 n.7 (11th Cir. 1996))).

Cir. 1996) ("We know of no [preexisting] case which might have clearly told Clifton that he could not take the disciplinary action indicated by an investigation which was initiated before he even knew about the allegedly protected speech, and in circumstances where the public concern implication was doubtful.").

However, the *Saucier* framework was made non-mandatory by the Supreme Court in *Pearson*, 555 U.S. at 236, in which the Court concluded that, "while the sequence set forth [in *Saucier*] is often appropriate, it should no longer be regarded as mandatory." Thus, "judges of the district courts and the courts of appeals should be permitted to exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand." *Id.*

Despite the Supreme Court's modification of *Saucier*'s analytical process, the substantive analysis remains unchanged; an officer is entitled to qualified immunity protection as long as he "could have believed" his conduct was lawful. *Hunter v. Bryan*, 502 U.S. 224, 227 (1991). Therefore, to deny immunity, a plaintiff must affirmatively demonstrate that "no reasonably competent officer would have" acted as the public official did. *Malley*, 475 U.S. at 341.

Based upon the foregoing principles, Ms. Zaner is entitled to qualified immunity. In terms of the threshold inquiry, Plaintiffs offer no on-point cases to show

that Ms. Zaner was acting outside the scope of her discretionary authority as a court referral officer and/or the head of the ECCRP concerning their constitutional claims. (Doc. 163 at 56). While Plaintiffs point out that qualified immunity does not protect a defendant from liability for "ministerial" acts or omissions (doc. 163 at 56), the Court disagrees with them that the CROFM transforms Ms. Zaner's job into one in which she exercises <u>no</u> discretion. Importantly, Plaintiffs do not set out any provisions of the CROFM that even pertain to calculating a probation term. Plaintiffs also do not show that Ms. Zaner was ever "act[ing] entirely on [her] own behalf" or "acting <u>wholly</u> outside the scope of [her] discretionary authority[.]" *Harbert Int'l, Inc. v. James*, 157 F.3d 1271, 1281 (11th Cir. 1998) (emphasis added).

Having found that Plaintiffs' constitutional claims do intersect with Ms. Zaner's exercise of discretionary authority, qualified immunity applies because Plaintiffs have failed to establish a triable constitutional claim. In the absence of a viable constitutional claim, Ms. Zaner cannot be personally liable to Plaintiffs under § 1983 for her own conduct or in a supervisory capacity.

Alternatively, even when assuming that Plaintiffs have adduced sufficient evidence from which a reasonable jury could find a Fourteenth or Eighth Amendment violation, Plaintiffs have not pointed to (and the Court has not independently found) any clearly established law that would have put Ms. Zaner on notice of her

unconstitutional conduct. More specifically, the law was not clearly established that Ms. Zaner violated Plaintiffs' rights under the Fourteenth or Eighth Amendment by failing to track Plaintiffs' maximum probation periods under the APS and/or the AMCPS. Indeed, as mentioned earlier, neither the AMTA–the statute that governs court referral officers like Ms. Zaner–nor the CROFM expressly renders her responsible for keeping track of maximum probation periods. Thus, qualified immunity provides an alternative basis for granting summary judgment to Ms. Zaner on Plaintiffs' constitutional claims.

### 5. Defendants have not carried their burden to show that they are entitled to quasi-judicial immunity.

Defendants also assert that they are entitled to quasi-judicial immunity. (Doc. 162 at 34-38). While the Court disagrees with Defendants that such a defense is available to the ECCRP as an entity, conceivably Ms. Zaner might have a right to rely upon that immunity. However, unlike Defendants' qualified immunity argument, Defendants have provided no examples of cases in which a private individual (as opposed to a public non-judicial official) was protected by such a defense.[30] Therefore, the Court rejects this part of Defendants' Motion as underdeveloped.

---

[30] Defendants' cases likewise lack an example of a private <u>entity</u> benefitting from quasi-judicial immunity.

**6. The Court does not reach the merits of the other grounds relied upon by Defendants to support a dismissal of Plaintiffs' constitutional claims.**

The remaining grounds that Defendants rely upon in support of dismissing Plaintiffs' Fourteenth and Eighth Amendment claims include statute of limitations (doc. 162 at 38-39), *Rooker-Feldman* (*id.* at 39-40), and *Heck v. Humphrey*'s favorable-termination rule. (*Id.* at 39-43). In light of the foregoing analysis, the Court finds that reaching these remaining issues is unnecessary. This is particularly so as Defendants' statute-of-limitations defense is a partial one that seeks only to dismiss alleged misconduct that occurred before July 1, 2011 (doc. 162 at 39), and because the Court has previously explained why *Rooker-Feldman* and *Heck v. Humphrey* do not bar Plaintiffs' federal claims. (*See* Doc. 62 at 15-24 (discussing why *Rooker-Feldman* does not preclude Plaintiffs' claims); *id.* at 24-30 (discussing why *Heck v. Humphrey* does not preclude Plaintiffs' claims)). Accordingly, those portions of Defendants' Motion challenging Plaintiffs' federal claims are due to be termed as moot.

**B. Plaintiffs Cannot Support a Negligent Training and/or Supervision Claim Under Alabama Law.**

As the Supreme Court of Alabama has observed:

[I]n order for an employer to be liable for the negligent hiring, training, retention, and supervision of its employee, the plaintiff must also prove "wrongful conduct" on the part of the employee. *University Fed. Credit*

*Union v. Grayson*, 878 So. 2d 280, 291 (Ala. 2003) ("[A] party alleging negligent supervision and hiring must prove the underlying wrongful conduct of the defendant's agents."); *Voyager Ins. Cos. v. Whitson*, 867 So. 2d 1065, 1073 (Ala. 2003) ("A party alleging negligent or wanton supervision and hiring must also prove the underlying wrongful conduct of employees."); *see also Stevenson v. Precision Standard, Inc.*, 762 So. 2d 820 (Ala. 1999) (holding that a jury verdict against an employer based on negligent training and supervision of a supervisor who allegedly sexually harassed a fellow employee could not stand where the jury also exonerated the supervisor); *Smith v. Boyd Bros. Transp., Inc.*, 406 F. Supp. 2d 1238, 1248 (M.D. Ala. 2005) ("Under Alabama law, the finding of underlying tortious conduct is a precondition to invoking successfully liability for the negligent or wanton training and supervision of an employee."); and *Thrasher v. Ivan Leonard Chevrolet*, *Inc.*, 195 F. Supp. 2d 1314, 1320 (N.D. Ala. 2002) ("In order to establish a claim against an employer for negligent supervision, training, and/or retention, the plaintiff must establish that the allegedly incompetent employee committed ... [a] tort.").

*Jones Exp., Inc. v. Jackson*, 86 So. 3d 298, 304 (Ala. 2010). The *Jones* court summarized these cases to mean, "implicit in the tort of negligent hiring, retention, training, and supervision is the concept that, as a consequence of the employee's incompetence, the employee committed some sort of act, wrongdoing, or tort that *caused* the plaintiff's injury." *Id.* at 305 (emphasis in original).

Consistent with the Court's analysis in § V.A.1-3 and the above collection of Alabama cases, Plaintiffs' negligent training and/or supervision count fails against the ECCRP because there is insufficient evidence of any underlying wrongful conduct committed by Ms. Zaner (or any other employee of the ECCRP for that matter). Additionally, Ms. Zaner cannot be liable for negligent training or supervision

because the ECCRP is the employer and not her. Importantly, Plaintiffs have not cited to any examples of cases in which a supervisor or manager (as opposed to an employer) has been held individually liable for negligent training under Alabama law.

Alternatively, to the extent that Plaintiffs can show a violation of a federal constitutional law, the AMTA, the APS, or the AMCPS by Ms. Zaner for failing to track maximum probation periods and/or continuing to keep Plaintiffs in the CRP beyond the two-year limit, this Court is persuaded that such wrongdoing is still inadequate to support an Alabama negligent training claim.

As an initial matter, Plaintiffs have not referred to any Alabama cases which have recognized that evidence of an underlying federal constitutional or a state statutory violation (of the AMTA, APS, or the AMCPS) may serve as a viable anchor for a negligent training claim.[31] With respect to statutory violations more specifically, several Alabama Supreme Court cases have indicated that, for a negligent training claim to be viable, an agent's wrongdoing cannot be based solely upon a statute. *See, e.g.*, *Johnson v. Brunswick Riverview Club, Inc.*, 39 So. 3d 132, 139 (Ala. 2009) (reasoning in its rejection of the plaintiff's negligent training and supervision claim tied to Alabama's Dram Shop Act that, Alabama "does not recognize a common law

---

[31] As stated in the preliminary issues section, Plaintiffs have agreed to a dismissal of all previously asserted common-law counts except for negligent training. Therefore, no underlying common-law claim remains to support Plaintiffs' negligence claim.

cause of action for negligence in the dispensing of alcohol." (emphasis added) (internal quotation marks omitted) (quoting *Ward v. Rhodes, Hammonds & Beck, Inc.*, 511 So. 2d 159, 164-65 (Ala. 1987))); *Gilmer v. Crestview Mem'l Funeral Home, Inc.*, 35 So. 3d 585, 596 (Ala. 2009) (rejecting "negligent-supervision claim . . . based solely on [the] violation of [Alabama's embalming] statute"); *see also Guy v. Alabama Power Co.*, No. 2:13CV8-MHT, 2013 WL 3929858, at *2 (M.D. Ala. July 29, 2013) ("[T]he tort does not include those instances where the wrongful conduct is based on only an Alabama statute."). Thus, persuaded by *Johnson*, *Gilmer*, and *Guy*, the Court alternatively concludes that Ms. Zaner's purported violations of the AMTA, APS, and the AMCPS cannot support Plaintiffs' negligent training count. *Cf. Guy*, 2013 WL 3929858, at *5 ("[E]ven if *Jones* did create an opening for a claim against employers for the negligent or wanton hiring, training, and supervision of their employees based on their employees' wrongdoings <u>other than those prohibited by common-law torts</u>, this court cannot conclude that the statute[s] that [Plaintiffs] cite[] would be such [] bas[e]s.") (emphasis added).

As for Ms. Zaner's purported constitutional violations, the Court agrees with *Guy* that:

> <u>[I]t is clear that the employee's wrongdoing must be based on state, and not federal, law</u>. Otherwise, the tort of negligent or wanton hiring, training, and supervision could be a corridor through which federal laws prohibiting various types of conduct by employees could be

incorporated into state law as a privately redressable requirement on employers to stop their employees from engaging in such conduct. "[M]ak[ing] an educated guess of how the Alabama courts, and, in particular, the Alabama Supreme Court," would answer this question, *Palmer v. Infosys Technologies Ltd. Inc.*, 888 F. Supp. 2d 1248, 1252 (M.D. Ala. 2012) (Thompson, J.), this court confidently doubts that the *Jones* court intended such potentially indiscriminate and broad incorporation of federal law into state law.

*Guy*, 2013 WL 3929858, at *2 (emphasis added). In *Guy*, the district court dealt with a negligent training claim premised upon an Alabama statute–Ala. Code § 31-12-2– that expressly invokes the federal Uniformed Services Employment and Reemployment Rights Act ("USERRA") as applicable to the Alabama National Guard. 2013 WL 3929858, at *4. This Court sees no reason why a negligent training claim based upon an employee's federal unconstitutional conduct should be treated any differently than one based upon federal statutory violations. Accordingly, this Court alternatively concludes that, as a matter of law, Plaintiffs cannot rely upon evidence of a federal constitutional violation to support their Alabama negligent training count.

Finally, *Armstrong Bus. Servs., Inc. v. AmSouth Bank*, 817 So. 2d 665 (Ala. 2001), provides another reason why Plaintiffs cannot prevail on their negligent training claim. *Armstrong* addresses the element of notice in connection with asserting negligent training:

A plaintiff must establish "by affirmative proof" that the employer

actually knew of the incompetence, or that the employer reasonably should have known of it. *Lane v. Central Bank*, 425 So. 2d 1098, 1100 (Ala. 1983), quoting *Thompson v. Havard*, 285 Ala. 718, 723, 235 So. 2d 853, 858 (Ala. 1970). To carry this burden, <u>the plaintiff may show either that he informed the employer about specific misdeeds of the employee, or that the employee's misdeeds were "of such nature, character, and frequency that the master, in the exercise of due care, must have had them brought to his notice</u>." *Lane*, 425 So. 2d at 1100.

*Armstrong*, 817 So. 2d at 683 (emphasis added). Here, Plaintiffs have provided no affirmative proof that they complained (pre-lawsuit) to Ms. Zaner or anyone else at the ECCRP about the wrongful conduct or incompetence that they perceived was taking place with respect to their maximum probation terms.

Further, allegations that Ms. Zaner made mistakes without more "do not amount to proof that [the ECCRP] was aware [or reasonably should have been aware] of and, negligently or wantonly, disregarded acts of incompetence by [Ms. Zaner] that damaged [Plaintiffs]." 817 So. 2d at 683. In particular, as the record lacks any straightforward statutory wrongdoing on the part of Ms. Zaner, the ECCRP cannot be subject to liability for failing to reasonably take notice of such dubious incompetence. *Cf. Armstrong*, 817 So. 2d at 682 ("[I]t is proper, <u>when repeated acts of carelessness and incompetency of a certain character</u> are shown on the part of the servant to leave it to the jury whether they would have come to [the employer's] knowledge, had he exercised ordinary care." (emphasis added) (internal quotation marks omitted) (quoting *Big B, Inc. v. Cottingham*, 634 So. 2d 999, 1003 (Ala. 1993),

*abrogated on other grounds by statute as stated in Horton Homes, Inc. v. Brooks*, 832

So. 2d 44, 57 (Ala. 2001))). Therefore, Plaintiffs' Count Seventeen alternatively fails

because no reasonable jury could find that the ECCRP had or reasonably should have

had notice of Ms. Zaner's incompetence.

### C.     Summary Judgment Is Appropriate on Plaintiffs' Count for Injunctive Relief.

Defendants challenge Plaintiffs' ability to assert claims for injunctive relief on

the grounds that they lack standing to do so or that the relief they seek has been

rendered moot in light of the GMC Standing Order governing probation. (Doc. 162

at 49-50). In their opposition brief, Plaintiffs do not counter either one of these

jurisdictional contentions or otherwise resist the dismissal of their injunctive count.

Consequently, the Court finds that Plaintiffs have abandoned pursuit of their

injunctive claim.[32] *See, e.g.*, *Wilkerson v. Grinnell Corp.*, 270 F.3d 1314, 1322 (11th

Cir. 2001) (finding claim abandoned when argument not presented in initial response

to motion for summary judgment); *Bute v. Schuller International, Inc.*, 998 F. Supp.

1473, 1477 (N.D. Ga. 1998) (finding unaddressed claim abandoned); *see also*

*Coalition for the Abolition of Marijuana Prohibition v. City of Atlanta*, 219 F.3d

1301, 1326 (11th Cir. 2000) (failure to brief and argue issue at the district court is

---

[32]     As discussed in the preliminary issues section, Plaintiffs have conceded that their
declarative count is subject to dismissal.

sufficient to find the issue has been abandoned); *Resolution Trust Corp. v. Dunmar Corp.*, 43 F.3d 587, 599 (11th Cir. 1995) ("[T]he onus is upon the parties to formulate arguments; grounds alleged in the complaint but not relied upon in summary judgment are deemed abandoned."); *Hudson v. Norfolk Southern Ry. Co.*, 209 F. Supp. 2d 1301, 1324 (N.D. Ga. 2001) ("When a party fails to respond to an argument or otherwise address a claim, the Court deems such argument or claim abandoned." (citing *Dunmar*, 43 F.3d at 599)); *cf. McMaster v. United States*, 177 F.3d 936, 940-41 (11th Cir. 1999) (claim may be considered abandoned when district court is presented with no argument concerning a claim included in the plaintiff's complaint); *Road Sprinkler Fitters Local Union No. 669 v. Independent Sprinkler Corp.*, 10 F.3d 1563, 1568 (11th Cir. 1994) (concluding that a district court "could properly treat as abandoned a claim alleged in the complaint but not even raised as a ground for summary judgment"). Thus, due to abandonment, Plaintiffs' Count Twenty-One is due to be dismissed for lack of subject matter jurisdiction.

## VI.  CONCLUSION

Consistent with the foregoing analysis, Defendants' Motion is due to be and hereby is granted in part and otherwise denied or termed as moot. Further, with no pending claims remaining, the Court will enter a separate final judgment order dismissing Plaintiffs' lawsuit.

**DONE** this the 30th day of March, 2018.

VIRGINIA EMERSON HOPKINS
United States District Judge